Hargroves and another, adm'r, &c. *vs.* Cooke.

| 15 | 321 |
|----|-----|
| 100 | 647 |
| 15 | 321 |
| 129 | 138 |

No. 43.—JAMES HARGROVES and another, administrators, &c. *vs.* CHARLES C. COOKE.

[1.] To charge a party upon a special promise, to answer for the debt of another, there must be a written agreement, or memorandum thereof, which will not be valid unless it shows a consideration.

[2.] The consideration need not be expressed nor formally stated, but it must, at least, appear clear and without ambiguity ; a mere conjecture, however plausible, is not sufficient to satisfy the Statute.

[3.] If the instrument expressly guaranties past and future advances, in consideration of advances to be made, it is good as to the whole.

[4.] So also, if forbearance to sue on an existing debt, can be certainly inferred from the instrument, it is a sufficient consideration.

[5.] The case of *Wain and Warlters*, cited and *questioned*.

[6.] The debtor has the right to prescribe the application of payments. If he omit to do so, the creditor may make the application as he pleases.—— The presumption is, in the absence of all proof as to the intention, that the oldest debt, or the first items in the running account, are to be first extinguished.

[7.] If neither debtor nor creditor apply the payment, the duty of doing so devolves upon the Court, who will make such application as is reasonable and equitable.

[8.] If one debt be the sole obligation of the debtor, and the other be with surety, guarantor or joint debtor, whether the sole debt be earlier or later, in point of time, the creditor, unless otherwise instructed, may apply a general payment to the debt which is not protected.

[9.] The word obligation, in its strict technical signification, imports a sealed instrument, at Common Law ; but in its broader and more extended sense, it means an instrument in writing, by which a party is bound in law.

[10.] The Legislature of 1792, in regulating the order in which debts of a decedent are to be paid, were neither guilty of tautology, nor vain repetition, in using the phrase, "bonds and other obligations".

[11.] By the Judiciary Act of 1789, all contracts in writing, with or *without seal*, which are *liquidated*, constitute a specialty for such debt. And by the Acts of 1792 and 1799, all *such writings* are placed on an equality with bonds.

[12.] A debt or demand is *liquidated*, when agreed on by the parties, or fixed as to the amount, by the operation of law.

[13.] A written guarantee to pay the future indebtedness of another, on *open account*, is not liquidated.

[14.] A bond debt, although for unliquidated damages, belongs to the preferred class, and must be paid before open accounts, because its *status* is fixed by the act itself.

[15.] As it respects all other demands below judgments, &c. the inquiry should be, not whether they are in writing, but whether they are or are not liquidated.

[16.] Another law compilation recommended.

Assumpsit, in Jackson Superior Court. Decision by Judge JACKSON, February Term, 1854.

On the 25th December, 1847, H. S. Butler gave the following guaranty :

Hargroves and another, adm'r, &c. *vs.* Cooke.

Mr. Charles Cooke,

SIR—After my compliments to you, you will please to let Nash Butler have a small stock of such clothing as he wants, and I will see it paid.

(Signed,)     H. S. BUTLER.

On the 4th January, 1850, he executed the following :

I, Henry S. Buttler, hereby engage to become security, and do hereby become security and guarantee, for the full and just payment of all dues, debts, demands and contracts, made between E. N. Butler and Charles C. Cooke ; that the said E. N. Butler will faithfully pay, or cause to be paid, to said C. C. Cooke, the debt now due from said Butler to said Cooke ; and also, all further liabilities for goods purchased of said C. C. Cooke by the said E. N. Buttler, whether in person, or by order of said Buttler ; and this guaranty is to be considered in full force and virtue against me, for the term of one year from this date. And also, it is understood the amount Mr. H. S. Butler hereby guaranties for his brother, E. N. Butler, is as a balance of account, not to exceed $2500 at the termination of the year.

(Signed,)     H. S. BUTLER.

E. N. Butler became insolvent, and H. S. Butler died, and suit was brought by Cooke, upon these guaranties. On the trial, he showed and proved an account current between himself and E. N. Butler, commencing the 8th January, 1848, with an item of $737, and ending in August, 1850, on which a balance was due of $2078$\frac{29}{100}$. The larger portion of the account was created between 8th January, 1848, and the 4th January, 1850. There were various items of cash paid on the credit side of the account current.

Upon the trial in the Court below, the presiding Judge decided—

1st. That the guaranty of 4th January, 1850, was good as to prospective credit, but void under the Statute of Frauds, as to debts due at the time of its execution ; and that the liability

of the guarantor, upon the first guaranty of 25th December, 1847, for a portion of the existing liability, was not a sufficient consideration appearing upon the face of the second guaranty, to sustain the same as to past liability.

To this decision Cooke excepted.

2d. That in the application of the payments made, (no appropriation having been made by either party,) the Court would apply the payments, first, to the oldest items in the account.

To this decision, both parties excepted; counsel for Cooke insisting that they should be applied to those items for which he had no security, (the debtor having no interest therein); counsel for Hargroves, administrator, insisting that they should be applied to those items on which Butler was surety.

3d. The Court decided, that the liability of Butler, upon the guaranty ranked in the distribution of his estate, among "bonds and other obligations".

To this decision, counsel for Hargroves excepted, insisting that the same ranked only as an "open account".

Upon these several exceptions, error has been assigned.

W. H. HULL, for Hargroves and another, administrators.

T. R. R. COBB, for Cooke.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] It is now, undoubtedly, law in England, that under 29 *Car.* 2 *C.* 3, *S.* 4, to charge a party upon a special promise to answer for the debt of another, there must be a written agreement or memorandum thereof, which will not be valid unless it shows a consideration. It is true, that the consideration need not be expressly and formally stated, but it must, at least, appear clear and without ambiguity. *James vs. Williams,* (5 *B. & Ad.* 1109.) (27 *E. C. L. R.* 280.) *Cole vs. Dyer,* (1 *Cr. & J.* 461.) (*S. C.* 1 *Tyrwhitt's R.* 304.)

[2.] In the first of these cases, *Patterson,* J. said—"The consideration need not be stated in express words, on the face

of the instrument ; it may be collected or implied, from the instrument itself ; but then, it must be collected, not as a matter of conjecture, but with certainty".

And in *Hawks against Armstrong*, (1 *New Cases*, 761, 27 *E. C. L. R.* 565,) the Lord Chief Justice of the Common Pleas, said—"It is not, however, necessary, that such consideration should appear in *express terms ;* it would undoubtedly be sufficient, in any case, if the memorandum is so framed that any person of ordinary capacity must infer, from the perusal of it, that such, and no other, was the consideration upon which the undertaking was given. Not that a mere conjecture, however plausible, that the consideration stated in the declaration, was that intended by the memorandum, would be sufficient to satisfy the Statute ; but there must be a well-grounded inference to be necessarily collected from the terms of the memorandum, that the consideration stated in the declaration was intended by the parties, to be the ground of the promise".

Now, the argument here is, that the guarantee, in its terms, covers future advances ; and that inasmuch as the Courts will not be strict in the construction of such instruments, (per *Tindal,* C. J. in *Newberry vs. Armstrong*, (4 *Bingham*, 201, 19 *E. C. L. R.* 55,) but they are "to be taken as strongly against the party giving the guarantee, as the sense of them will admit". *Mason vs. Pritchard* (12 *East.* 227), that it may be inferred that Sampson Butler intended to stipulate, not only for future advances to be made to his brother, but for forbearance to press him on past indebtedness.

[3.] Besides, it is insisted that the advance of future sums is a good consideration to support a promise to guarantee not merely future, but past advances ; that the contract cannot be divided, so as to leave one part of the guarantee without consideration ; that the whole constitutes one agreement, and the consideration goes to all.

As to the latter proposition, there could be no answer to it, if the instrument had expressly guaranteed past and future advances, in *consideration* of advances *to be* made. But, on

the contrary, not only is no such agreement expressed, but none such can be collected from the instrument.

The other is much the most reasonable conjecture. The probable inducement operating on the mind of Sampson Butler, to give this guarantee, being the support of Nash Buttler, generally, in his business, which might require both indulgence for the existing debt, as well as future accommodation. For, it would have been of little advantage to have provided for future advances, if Nash Buttler had been sued immediately for the old balance. Destruction of his commercial credit would have been the inevitable consequence.

[4.] If there were, therefore, in the instrument, any thing which would indicate that forbearance on the existing debt, entered into the consideration, we would gladly seize on it to uphold the agreement *in toto*. But the language of the instrument is too unambiguous to allow this. He simply promises "to pay the debt now due, and all further liabilities for goods purchased, not to exceed $2500 at the termination of the year".

We are left entirely to *guess*, as to the consideration which induced this promise; we cannot sufficiently see what it is. It is not pretended that there is any engagement here to forbear suing on the past advances. And we are not at liberty to form conjectures; this is too hazardous. The Statute of Frauds is not thus satisfied.

[5.] In *Wain vs. Warlters*, (5 *East. R.* 10,) the leading case upon this branch of the argument, it might have been fairly *conjectured* that the guarantee was given in consideration of forbearance to enforce against the principal, the bill which the plaintiffs held. But the Court pronounced the agreement invalid, for want of showing a consideration.

I am aware that the doctrine of *Wain and Warlters*, was considered and adopted by this Court, in *Henderson vs. Johnson*, (6 *Ga. R.* 390.) My examination of the case before me, has excited doubt as to the correctness of our conclusion.— From the repeated adjudications to be met with, in which the construction there put upon the Statute has been recognized,

Hargroves and another, adm'r, &c. *vs.* Cooke.

it seems to have been taken for granted, that it had become the settled rule of the English Courts, at the time of our adopting Statute. But in *ex parte Gardom*, (15 *Ves.* 286). Lord Eldon said—"until that case, (*Wain vs. Warlters*) was decided sometime ago, I had always taken the law to be clear, that if a man agreed in writing, to pay the debt of another, it was not necessary that the consideration should appear on the face of the writing".

Now, *Wain and Warlters* was decided by Lord *Ellenborough*, in 1804. Is it true, that before that time the term agreement had been construed according to its popular signification, and that a contrary interpretation was put upon it in that case for the first time? If so, then, so far from being bound by the rule there laid down, it is both our privilege and duty, to adhere to the law as it stood before that time. And this is a point I desire for myself, to have discussed, *upon authority.* It is important to explore, thoroughly, the precedents from the date of the Statute to the commencement of our Revolution. It never has been done in this Court. And as the investigation would lead to no practical result, in the case under consideration, I forbear to undertake the labor myself.

The doctrine of *Wain and Warlters*, has always been esteemed of doubtful policy and propriety. And I have no hesitation in saying, that it nullifies nine out of ten of all the *bona fide* securities given and received in good faith, without conferring any corresponding benefit.

Lord *Ellenborough* pronounced the Statute of Frauds, "one of the wisest laws in our Statute Book". Without taking issue with him, upon this subject, except so far as to notice that our last Legislature seems to have thought otherwise, for they have gone far to annihilate it; I would remark, that the reason upon which Lord *Ellenborough* made the decision in *Wain and Warlters*, is founded in an incorrect supposition. He supposed the Act to have been drawn by Sir *Matthew Hale*, and in view of his known accuracy, he concluded that the strict legal import of the word agreement must have been intended; and that it included, therefore, both promise and consideration.

Whereas, the history of the Statute, as appears from *Ash vs. Abdy*, (3 *Swanston's R.* 664,) and other sources, seems to be this : It was originally drawn by Lord *Hale*, and introduced into the House of Lords by Lord *Nottingham*, but in a different form from the first draft ; and it was subsequently "altered and patched up by the Judges and civilians, until it was moulded into its present shape". Thus it may be inferred, pretty satisfactorily, that the word *agreement* was either inserted through oversight, or was intended to be used in its ordinary and popular sense.

The States were, at first, pretty equally divided upon the question. But owing to local legislation, and a change of Judicial opinion, which South Carolina, and other States have undergone, it is now pretty generally held, that the consideration need not be stated.

To the opinion of the Court, as to the appropriation of the payments, both parties excepted. Cooke's counsel contended, that the payments should be first applied to the extinguishment of the intermediate items of indebtedness, contracted between the giving of the first and second guarantees, and which were covered by neither. On the other hand, the attorney of the estate of S. Butler, insisted that they should go to those items in the account, for which Sampson Buttler was security.

It will be remembered, that the dealings between Nash Butler and Cooke, commenced in January, 1848, and continued down to July, 1850. The first guarantee was given in December, 1847, and covers only the first item in the account, of $737 76, dated 7th of January, 1848. Further purchases were made throughout that and the succeeding years, and the second guarantee was given on the 4th of January, 1850, and the dealings terminated in July of that year.

The Court held, and perhaps properly, in reference to the exact condition of this account, that the payments should be applied to the oldest items in the account, first.

[6.] Mr. *Story*, in his treaties on the *Law of Contracts*, (*pages* 752–'3,) thus states the rule, as to the appropriation of payments on accounts : "The party who pays the money,

Hargroves and another, adm'r, &c. *vs.* Cooke.

has the right to apply it as he sees fit; if there be several debts due from him, he can designate that one to which it shall be applied. If the party making the payment do not, at the same time, make any specific appropriation thereof, then the party to whom the payment is made, may apply it as he pleases.

[7.] If neither party makes any specific application of the payments to the discharge of any particular debt, the presumption is, that the first items of a running account, or that the debts which are first in point of time, are to be thereby discharged. In all cases, if the parties, themselves, have omitted to make any specific appropriation of payments, the law will appropriate them according to the justice and equity of the case, for the benefit of both parties".

This text, which is an epitome of the authorities, justifies the opinion of the Court, under the facts and circumstances of this case.

[8.] That Cooke, the creditor, might have applied the payments made by N. Butler, to the items in the account which was not protected, and continued to hold S. Butler, the guarantor, bound for the balance, the law is clear—a guarantor or surety merely, as such, having no equity to compel or change an application of payments made by the creditor.— See note to *Mayor &c. of Alexandria vs. Patten and others,* (1 *Hare & Wallace's American Leading Cases,* 123.)

But here, the creditor, Mr. Cooke, applied the payments to the account, generally, and consequently, could not claim the benefits of this principle, however well established. And the point presented for the judgment of the Circuit Court, and for the opinion of this Court, is not what the creditor might have done, under the law, but what he did do. That he possesses large powers in the application of payments, will abundantly appear from the note in *Hare & Wallace.* He may waive them, however, and in the present case he has seen fit to do so.

[9.] Lastly, was the Court right in holding that the guarantee of S. Butler, ranked with "bonds and other obligations",

under the Act of 1792, for the distribution of an insolvent's estate ?

The attention of the profession has been repeatedly directed to the proper construction of this Statute. The omission to provide for the payment of notes and other liquidated demands, by name, has been attributed to oversight ; and by a strained interpretation, as it has been usually supposed, all this class of claims have been arranged under the term, "other obligations" in the Act, and thus placed on a level with bonds.

[10.] The suggestion may seem almost presumptuous, at this late day. We live, however, to learn, and we think, that a recurrence to elementary principles, and to the early legislation upon this subject, will serve to explain the true intent of the Act, and to vindicate its authors, against the charge of using language, the legal import of which they did not themselves clearly comprehend. "Next bonds and *other obligations*"— say the objectors, this is mere tautology. The word obligation, *ex vi termini*, imports a sealed instrument, that is, means a bond. In its most technical signification, this is true. In *Comyn's Digest*, obligation is defined to be a deed, whereby a man binds himself, under a penalty, to do a thing. But, in its more popular sense, the term obligation signifies the instrument or writing, by which the contract is witnessed. And the Assembly may well be supposed to have used the word in its ordinary sense. And it is in this view of it that our Courts have held, that all written contracts are obligations, in contemplation of the Statute. And they have been ranked with bonds, in the distribution of the assets of an insolvent's estate.

Upon strictly legal principles, then, it is plain that the framers of the Act of 1792, employed apt and proper phraseology, in regulating the order in which the debts of an estate should be paid; and that, in using the words "bonds and other obligations", they have been guilty of no vain repetition. (1 *Burrill's Law Dictionary*, 764. *Bouvier's Dictionary* Title "Obligation".)

[11.] But by the 57th section of the Judiciary Act of 1789, ( *Watkins' Digest*, 404,) it is declared, that all judgments,

bonds, bills, promissory notes, or other writings, *with or without seal*, where the debt or demand is *liquidated*, and signed with the hand of the debtor, *such writing* shall constitute a *specialty* for such debt".

Here, then, by express enactment, promissory notes and all other written evidences of debt, "with or *without* seal", are constituted *specialties*, for such debt, provided they be *liquidated*.

Then, by the 38th section of the Judiciary Act of 1792, passed, not only in the same year, but on the same day with the Act directing the order in which the debts of a decedent shall be paid, to-wit: the 18th day of December, 1792, (*Watkins*, 488,) "all promissory notes and other *liquidated* demands", are declared to be of *equal dignity*. The same clause is found in the Act of 1799, but that Act being seven years junior, in point of time, to the Act of 1792, regulating the dignity of debts, has been treated as having little or no application to it. But when it is discovered that this is a re-enactment, only, of the same provision in the Judiciary Act of 1792, which was passed simultaneously with the Distribution Act, it must be seen that it has an important bearing upon the proper exposition of that Act.

When the Legislature, in 1792, omitted to mention notes and other liquidated demands, and speak only of "bonds and other obligations", they used language which was not only warranted by its popular sense, but which was technically accurate and correct, according to the Act of 1789. For by that Act, all such demands are declared to be *specialties*, for the purposes of such debt. And then, by the Judiciary Act of 1792, as well as that of 1799, they are declared to be of equal dignity with bonds. That this equality extends to the order of their payment, there can be no question; that it stops there, is by no means certain.

So much by way of explanation or verbal criticism.

Now, then, in view of all this legislation, what is the true intent and meaning of the Act under consideration? It is no more nor less than this: that all bonds *and liquidated demands*

are next to judgments, &c. to be first paid; all others are open accounts, and consequently, are last to be paid.

[12.] When is a debt said to be *liquidated*—a distinction so prominently preserved throughout the whole of our legislation? I answer, whenever the amount due is agreed upon by the parties, or fixed by operation of law. A debt may be in writing, and not liquidated, or *vice versa*, it may be liquidated, though not in writing. Open accounts are raised by one party only. The merchant, the mechanic, and all others with whom we deal, may charge what they please. It is an *ex parte* affair. The account is open till agreed to by the other party. It may be scaled, by showing that the goods or work is overcharged. A shop-keeper may produce a written order for every item in his customer's bill. Still, this does not liquidate it. On the other hand, there may be no written proof; still, if the debtor has acknowledged the justice of the account, it is no longer the act of one party, but the agreement of both—it is liquidated. The case of *Lawson and Nisbet*, so often cited, sufficiently illustrates what is meant by liquidation, by operation of law. It is the collection of money by an agent, the payment of a debt by a security, and such like cases, where the liability is for a fixed and precise sum, or nothing at all.

[13.] Is, then, a written guarantee to pay the future indebtedness of another, on open account, liquidated? True, it is in writing, and but for our Statutes, would constitute, in common parlance, an *obligation;* and consequently, would take rank with the preferred class. But under our law, a *writing, merely,* does not suffice. It must be *liquidated*. From the very nature of the case, this guarantee cannot be. The amount of indebtedness, as between Nash Butler and Cooke, is not liquidated. It is open for future adjustment. How can it be claimed, then, that the guarantee of Sampson Butler, to see this open account debt, whatever it might be, short of $2500, paid, is liquidated?

[14.] A bond debt, whether liquidated or not, must be paid, because the Statute says so. It may be for unliquidated dam-

Hargroves and another, adm'r, &c. vs. Cooke.

ages, as for the breach of a covenant to make titles to land. Still, if it be a *bond* debt, it must be discharged.

[15.] But as it respects all other demands, the inquiry is, not whether they are *in writing*, but whether they be *liquidated?* For I repeat, that although *in writing*, still, if they be not *liquidated*, they are not in the nature of *specialties*, and must be postponed. And although not in writing, still, if they be liquidated, they must be satisfied before open accounts; if not, because they are *pro hac vice specialties*, they are not *open* accounts, which stand "solitary and alone", at the bottom of the descending grade. Rightly or otherwise, in my humble opinion, most wrongfully, as are all distinctions in debts—they occupy " a lower deep" than any other species of indebtedness.

[16.] I would not thoughtlessly aggravate the bibliomania or extravagant desire of multiplying books abroad in the land; still, if there be any member of the bar who feels burdened to discharge the duty which Sir *Edward Coke* says every man owes to his profession, to bring forth something of this sort, "according to his power, place and capacity", I would suggest that a small volume, containing all the old Constitutions, Judiciary Acts and other general Statutes, State and Colonial, which were of force in Georgia, prior to 1799, and which are not to be found in any of the existing Digests, except Watkins, which is nearly out of print—and some of these Statutes, as for instance the Judiciary Act of 1796, which was only partially repealed by that of 1797, is not even in Watkins; such a compilation, I am persuaded, would be an acceptable contribution to our libraries. And especially should the author not forget to begin, by inserting an *authentic* copy of the Colonial Charter.