A10A0745. PECK et al. v. LANIER GOLF CLUB, INC.
(697 SE2d 922)

BERNES, Judge.

This is the second appearance of this case before our Court. Michael D. Peck has filed this lawsuit on behalf of himself and all homeowners with lots adjacent to the Lanier Golf Club, Inc. Peck seeks a declaratory judgment that the adjacent lot owners have an irrevocable easement or implied covenant in Lanier's golf course and an injunction restricting the use of Lanier's property to "golf course purposes only." Peck filed a motion for class certification, which the trial court denied. In Case No. A09A0639, we vacated the trial court's decision and remanded the case for further proceedings

because the trial court failed to make the required findings of fact and conclusions of law pursuant to OCGA § 9-11-23, the class action statute. See *Peck v. Lanier Golf Club*, 298 Ga. App. 555 (680 SE2d 595) (2009).

Following remand, the trial court entered an order that again denied class certification and also dismissed Peck's complaint. Peck then filed the instant appeal challenging the trial court's findings and conclusions. Because there was some evidence to support the trial court's finding that the class did not share common factual issues, the trial court did not abuse its discretion in denying class certification. The trial court's dismissal of the complaint after ruling on the class certification motion, however, was improper. Accordingly, we affirm in part, and reverse in part.

The record shows that in 1970, the owner of a large tract of rural land in Forsyth County developed an 18-hole golf course. At that time, the golf course was the only development in the area. The golf course became known as the Canongate Golf Club and eventually was conveyed to Lanier Golf Club, which took over operations of the golf course.

In 1971, the owner of property located adjacent to the golf course began selling sections of property to various residential developers for the construction of multiple subdivisions containing single family residences and town homes. The developers involved with the subdivision projects included Habersham on Lanier; Arasom, N.V.; John Wieland; Lanier Golf Club; Four Mantons, Inc.; and Michael Smith Homes. The properties on the north and west sides of the golf course were conveyed to Habersham on Lanier for a development that eventually became the Habersham subdivision. A section of property in the Habersham subdivision was later conveyed to John Wieland for development. Four Mantons, Inc. and Michael Smith Homes also developed a part of this property.

The properties on the south and east sides of the golf course were conveyed to Arasom, N.V. for a development that eventually became the "Canongate on Lanier" subdivision, which included several sections designated as Sections C, E, F, G, H and J and was referred to as the "Fairway Estates" community. Arasom later conveyed several lots from Section J of the Fairway Estates community to Lanier Golf Club for development. Lanier Golf Club sold Peck his lot in the subdivision.

Different realtors were involved in the sales of the various subdivisions. In 1979, Arasom reached an agreement that authorized it to use the trade name "Canongate on Lanier" for its subdivision, on the condition that Arasom's agents and realtor inform all prospective buyers, lot purchasers, and any others associated with the development that Arasom was "in no way affiliated with . . . the

ownership or operation of the [golf course]" and to give written notice that "no membership or use rights of any kind whatsoever in the [golf course] [were] granted by virtue of the purchase of the subject property from [Arasom]." The realtor who was the exclusive marketing agent for the Arasom development testified that she had disclosed to prospective buyers that there was no right to use the golf course, in accordance with the Arasom agreement.

Peck's lot purchase agreement contained a clause that provided that "[n]o representation, promise, or inducement not included in [the agreement] shall be binding upon any party hereto." His purchase agreement did not contain any representations regarding the golf course. In addition, Peck, along with all other purchasers who bought lots in the Arasom development, signed addendums to the closing statements, which contained the following acknowledgment:

> Purchaser understands that seller is not affiliated with or a part of [the golf course], and that purchaser shall not receive any membership in or right of use of [the golf course] as a result of the purchase of the . . . property.

All purchasers who had bought lots in Section J of the Arasom development, including Peck, had signed the written acknowledgments in their transactions.

A marketing brochure for the Canongate on Lanier subdivision showed photographs of the golf course and described the Fairway Estates community as being "nestled in the meticulously sculptured landscape of [the] 18-hole golf course." Several landowners who had purchased lots adjacent to the golf course testified that the properties were marketed as having a golf course view, that they had chosen homes in subdivisions because of the golf course, and that they had paid a premium for their lots because they were located adjacent to the golf course. Some landowners also testified that they had purchased golf club memberships so that they could have access to the golf course.

In January 2006, Lanier Golf Club announced that they planned to close the golf course and to sell the property for a high density development. At the end of 2006, Lanier terminated all memberships in the club. The golf course remained open to the public until September 2007. Lanier then closed the golf course and denied the adjacent landowners access to the golf course property.

Peck filed this lawsuit on behalf of himself and other similarly situated landowners, claiming that the landowners had acquired an "easement or an implied covenant" in the golf course. Peck's suit requested the court to "declare and enforce against [Lanier] or any

new owners an implied restriction limiting use of this property to golf course purposes only." Peck filed a motion for class certification under OCGA § 9-11-23 (a) and (b) (2), asserting that he was the representative of the putative class that consisted of 121 landowners who owned lots adjacent to the golf course and who claimed an easement or implied covenant in the golf course. Following an evidentiary hearing, Peck's motion was denied.

1. OCGA § 9-11-23 sets forth the requirements for class certification. See *Peck*, 298 Ga. App. at 556-557. The named plaintiff must show numerosity, commonality, typicality and adequacy of representation. See id.; OCGA § 9-11-23 (a). "A trial court may deny class certification where a plaintiff fails to establish even one of the required Rule 23 factors, and we will affirm the trial court's decision absent an abuse of discretion. A trial court's denial of class certification . . . will be affirmed if right for any reason." (Citations and punctuation omitted.) *Perez v. Atlanta Check Cashers*, 302 Ga. App. 864, 867-868 (692 SE2d 670) (2010). See also *Duffy v. The Landings Assn.*, 254 Ga. App. 506, 509 (1) (563 SE2d 174) (2002). Here, the trial court's denial of class certification was proper since there was some evidence that Peck failed to show commonality, i.e., questions of law and fact common to the class members.[1] See OCGA § 9-11-23 (a) (2).

To establish commonality, a plaintiff must show that the class members are similarly situated. See *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 127 (3) (610 SE2d 529) (2005). "[A] common question is not enough when the *answer* may vary with each class member and is determinative of whether the member is properly part of the class." (Punctuation and footnote omitted.) Id. at 129 (4). "[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (Citation and punctuation omitted.) *McGarry v. Cingular Wireless*, 267 Ga. App. 23, 25 (1) (599 SE2d 34) (2004). Accordingly, the determination of whether class certification is proper necessarily requires an examination of the issues involved in Peck's claim. Id.

Peck alleged that the landowners who had purchased lots adjacent to the golf course had acquired an irrevocable easement or implied covenant to the golf course. There were no existing restric-

---

[1] Peck's claim that the owner of Lanier made an in judicio admission that the commonality requirement had been satisfied is without merit. "An admission in judicio applies only to the admission of fact and does not apply where the admission is merely the opinion or conclusion of the pleader as to law or fact." (Citation and punctuation omitted.) *Southern Business Machines &c. v. Norwest Financial Leasing*, 194 Ga. App. 253, 257 (2) (390 SE2d 402) (1990). The owner's statement expressed a conclusory opinion as to the legal issue, and thus, did not amount to an admission in judicio. See id.

tions mandating that the property be maintained as a golf course in the deeds covering the golf course or the surrounding properties.[2] Consequently, to prevail on their claim, the members of the prospective class needed to show that they purchased their lots according to a recorded subdivision plat which had the golf course area designated on it and that they paid more for their golf course lots. See *Forsyth County v. Martin*, 279 Ga. 215, 217 (1) (610 SE2d 512) (2005); *Walker v. Duncan*, 236 Ga. 331, 332 (223 SE2d 675) (1976); *Patterson v. Powell*, 257 Ga. App. 336, 337-339 (571 SE2d 400) (2002). Alternatively, the members of the prospective class could establish their claim by showing that the developers made oral assurances or representations that the golf course would remain on the property and that they relied upon those assurances in deciding to purchase their lots. See *Knotts Landing Corp. v. Lathem*, 256 Ga. 321, 323-324 (2), (3) (348 SE2d 651) (1986).

In support of the motion for class certification, Peck presented several surveys and plats showing the golf course, Lake Lanier, and all of the surrounding land in general. None of the surveys and plats, however, contained information establishing that the property and golf course were being developed as a general subdivision plan. Significantly, the evidence showed that the lots purchased by the prospective class members were not developed and sold in a single, comprehensive subdivision. To the contrary, the residential developments arose out of multiple projects by different developers and resulted in different subdivisions with separate sections.

Moreover, different realtors had been involved in the subdivision sales, and there was no evidence showing that the realtors had used the same materials, plat, and representations in marketing their respective subdivisions. Although the realtor who had assisted Peck with his purchase testified about her involvement with the Arasom development, she stated that she had not been involved in the sales for the Habersham and Wieland developments. And while there was evidence that the purchasers in the Arasom development executed acknowledgments that may have precluded their purported reliance upon any representations regarding the golf course, no similar evidence was presented for the purchasers in the other developments. The circumstances surrounding the lot sales in the various

---

[2] The original deed conveying the property for the golf course development contained a restriction requiring that the property be used for the operation of a golf course for a period of seven to eight years. The restriction expired by its terms in 1977. Habersham on Lanier had entered into a Golf Course Operating Agreement and Golf Course Lease Agreement with the owner and the operator of the golf course, which required the golf course to be present and available to enhance the residential development. Those agreements expired by their terms in 1979.

subdivisions were not similar.

The trial court was thus authorized to find that resolution of the issues would require individual determinations as to the representations made to each property owner and the extent to which each owner relied upon the representations. The trial court therefore did not abuse its discretion in finding that class certification was not appropriate. See *Carnett's, Inc.*, 279 Ga. at 128-129 (4); *Tanner v. Brasher*, 254 Ga. 41, 45 (2) (326 SE2d 218) (1985); *Duffy*, 254 Ga. App. at 508-509 (1).[3]

2. After ruling that class certification was not proper in this case, the trial court dismissed the complaint. The dismissal was based upon the trial court's finding that Peck was not an adequate representative of the class that he sought to represent and no other class representative had been identified.[4]

"Even if the court determined that the action brought as a class should not be so maintained, this would not afford a basis for dismissing the complaint. Rather, such a determination would mean that the action would be stripped of its character as a class action and would proceed as a non-class action." (Citation omitted.) *Dillingham v. Doctors Clinic*, 138 Ga. App. 41, 42 (3) (225 SE2d 500) (1976). After denying class certification, the trial court was required to allow reasonable time for joinder of the proper plaintiffs before dismissing the action. See *Fairfield Plantation &c. v. Plantation Equity Group*, 215 Ga. App. 746, 747 (3) (452 SE2d 147) (1994), citing *Equitable Life Assurance &c. v. Tinsley Mill Village*, 249 Ga. 769, 772 (2) (294 SE2d 495) (1982). The trial court's dismissal of the complaint was erroneous; thus, we must reverse on this ground.

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Senior Appellate Judge G. Alan Blackburn concur.*

DECIDED JULY 7, 2010.

*McFarland & McFarland, Robert P. McFarland, Sr.*, for appellants.

---

[3] Compare *Fortis Ins. Co. v. Kahn*, 299 Ga. App. 319, 322-323 (2) (a), (b) (683 SE2d 4) (2009) (affirming the trial court's decision to certify the class; the plaintiffs' fraud claims did not require individualized determinations since the defendant's alleged misrepresentations were made in writing on the standardized, uniform documents sent to all class members and reliance was shown by the class members' renewal of their policies based upon the misrepresentations).

[4] We need not address the propriety of the trial court's ruling as to the adequate representation requirement in light of our holding in Division 1 that the denial of class certification was proper based upon Peck's failure to show commonality. See *Perez*, 302 Ga. App. at 867-868.

*Hasty & Pope, Marion T. Pope, Jr., Dillard & Galloway, Andrea C. Jones*, for appellee.