A11A2100. PECK v. LANIER GOLF CLUB, INC.
(726 SE2d 442)

MILLER, Judge.

Michael D. Peck filed this action for a declaratory judgment and an injunction against Lanier Golf Club, Inc., claiming that he acquired an implied easement or implied restrictive covenant in Lanier's adjacent golf course property.[1] Lanier filed a motion for summary judgment, contending that there is no evidence supporting Peck's claims. The trial court granted Lanier's motion, from which Peck appeals.[2] Peck contends that the trial court's grant of summary judgment in Lanier's favor was improper since there was a genuine

---

[1] This is the third appeal of this case before our Court. See *Peck v. Lanier Golf Club*, 298 Ga. App. 555 (680 SE2d 595) (2009) (*"Peck I"*); *Peck v. Lanier Golf Club*, 304 Ga. App. 868 (697 SE2d 922) (2010) (*"Peck II"*). The prior appeals pertained to the trial court's decisions denying class certification pursuant to OCGA § 9-11-23. See *Peck I*, supra, 298 Ga. App. at 555; *Peck II*, supra, 304 Ga. App. at 868-869.

[2] We note that after the trial court entered its order granting Lanier's motion for summary judgment, Lanier filed a notice that Peck had transferred his interest in his property to a third party. Generally, when a plaintiff's claims for injunctive relief and declaratory judgment are predicated upon his status as a landowner, the subsequent transfer of his ownership interest would divest him of standing to pursue his claims and render his claims moot. See *Goodyear v. Trust Co. Bank*, 247 Ga. 281, 284 (1) (276 SE2d 30) (1981). As an exception, however, when "the error is capable of repetition and yet evades review, the appeal will be considered." (Citation and punctuation omitted.) *Collins v. Lombard Corp.*, 270 Ga. 120, 121 (1) (508 SE2d 653) (1998). In the instant appeal, the parties do not contend that the claims under review are moot. To the extent that a decision in this case "would be based on existing facts or rights which affect, if not the immediate parties, an existing class of sufferers," id. at 122, we shall review the claims presented.

issue of material fact as to whether an implied easement in the golf course existed. We discern no error and affirm.

␣n appeal of a grant of summary judgment, the appellate court must determine whether the trial court erred in concluding that no genuine issue of material fact remains and that the party was entitled to judgment as a matter of law. This requires a de novo review of the evidence. Summary judgment is appropriate when the court, viewing all the facts and evidence and reasonable inferences from those facts in a light most favorable to the non-movant, concludes that the evidence does not create a triable issue as to each essential element of the case.

(Citations and punctuation omitted.) *Rubin v. Cello Corp.*, 235 Ga. App. 250, 250-251 (510 SE2d 541) (1998).

So viewed, the undisputed facts and evidence in this case are as set forth in the prior appeal of *Peck II*:

[I]n 1970, the owner of a large tract of rural land in Forsyth County developed an 18-hole golf course. At that time, the golf course was the only development in the area. The golf course became known as the Canongate Golf Club and eventually was conveyed to Lanier Golf Club, which took over operations of the golf course.

In 1971, the owner of property located adjacent to the golf course began selling sections of property to various residential developers for the construction of multiple subdivisions containing single family residences and town homes. The developers involved with the subdivision projects included Habersham on Lanier; Arasom, N.V.; John Wieland; Lanier Golf Club; Four Mantons, Inc.; and Michael Smith Homes. . . .

The properties on the south and east sides of the golf course were conveyed to Arasom, N.V. for a development that eventually became the "Canongate on Lanier" subdivision, which included several sections designated as Sections C, E, F, G, H and J[.] . . . Arasom later conveyed several lots from Section J . . . to Lanier Golf Club for development. Lanier Golf Club sold Peck his lot in the subdivision.

. . .

In 1979, Arasom reached an agreement that authorized it to use the trade name "Canongate on Lanier" for its subdivision, on the condition that Arasom's agents and realtor inform all prospective buyers, lot purchasers, and

any others associated with the development that Arasom was "in no way affiliated with . . . the ownership or operation of the [golf course]" and to give written notice that "no membership or use rights of any kind whatsoever in the [golf course] [were] granted by virtue of the purchase of the subject property from [Arasom]." The realtor who was the exclusive marketing agent for the Arasom development testified that she had disclosed to prospective buyers that there was no right to use the golf course, in accordance with the Arasom agreement.

Peck's lot purchase agreement contained a clause that provided that "[n]o representation, promise, or inducement not included in [the agreement] shall be binding upon any party hereto." His purchase agreement did not contain any representations regarding the golf course. In addition, Peck, along with all other purchasers who bought lots in the Arasom development, signed addendums to the closing statements, which contained the following acknowledgment:

Purchaser understands that seller is not affiliated with or a part of [the golf course], and that purchaser shall not receive any membership in or right of use of [the golf course] as a result of the purchase of the . . . property.

. . .

A marketing brochure for the Canongate on Lanier subdivision showed photographs of the golf course and described the . . . community as being "nestled in the meticulously sculptured landscape of [the] 18-hole golf course." [Peck testified that he paid a premium for his property based on its location adjacent to the golf course.] . . .

In January 2006, Lanier Golf Club announced that they planned to close the golf course and to sell the property for a high density development. At the end of 2006, Lanier terminated all memberships in the club. The golf course remained open to the public until September 2007. Lanier then closed the golf course and denied the adjacent landowners access to the golf course property.

Peck filed this lawsuit . . . claiming that [he] had acquired an "easement or an implied covenant" in the golf course. Peck's suit requested the court to "declare and enforce against [Lanier] or any new owners an implied restriction limiting use of this property to golf course purposes only."

(Punctuation omitted.) *Peck II*, supra, 304 Ga. App. at 869-871.

Since there were no existing express restrictions mandating that Lanier's property be maintained as a golf course,[3]

> to prevail on [his] claim, [Peck] needed to show that [he] purchased [his] lot[ ] according to a recorded subdivision plat which had the golf course area designated on it and that [he] paid more for [his] golf course lot[ ]. See *Forsyth County v. Martin*, 279 Ga. 215, 217 (1) (610 SE2d 512) (2005); *Walker v. Duncan*, 236 Ga. 331, 332 (223 SE2d 675) (1976); *Patterson v. Powell*, 257 Ga. App. 336, 337-339 (571 SE2d 400) (2002). Alternatively, [Peck] could establish [his] claim by showing that the developers made oral assurances or representations that the golf course would remain on the property and that [he] relied upon those assurances in deciding to purchase [his] lot[ ]. See *Knotts Landing Corp. v. Lathem*, 256 Ga. 321, 323-324 (2), (3) (348 SE2d 651) (1986).

(Punctuation omitted.) *Peck II*, supra, 304 Ga. App. at 871-872 (1). "Limitations on use of land by implication are not favored and must be strictly construed against the person seeking the restriction. The standard of proof of a restrictive covenant by implication is only evidence that is clear and beyond a reasonable doubt." (Citations and punctuation omitted.) *Roth v. Connor*, 235 Ga. App. 866, 870 (1) (b) (510 SE2d 550) (1998). Bearing these principles in mind, we address Peck's claims in turn below.

(a) *The "Common Grantor" Method.* Georgia jurisprudence recognizes that "[p]arties may . . . take actions from which courts will imply an agreement to restrict the uses allowed upon a tract of land." (Citation omitted.) *Knotts Landing Corp.*, supra, 256 Ga. at 323 (2). When a common grantor sells lots of land based on a recorded plat showing an easement or referencing an easement in the grantee's deed, the grantor is estopped from denying the existence of the easement. See, e.g., *Westbrook v. Comer*, 197 Ga. 433, 438-439 (29 SE2d 574) (1944). Similarly stated,

> [i]t is well-established that where a developer sells lots according to a recorded plat, the grantees acquire an easement in any areas set apart for their use. An easement acquired in this manner is considered an express grant, and is an irrevocable property right. The rationale is that the

---

[3] The original deed conveying the property for the golf course development contained a restriction that the property be used for the operation of a golf course for a period of seven to eight years. That restriction, however, expired by its terms in 1977.

grantees of the property have given consideration for its enhanced value in the increased price of their lots.

(Citations and punctuation omitted.) *Walker*, supra, 236 Ga. at 332. The Supreme Court of Georgia applied this principle in *Forsyth*, supra, 279 Ga. at 217 (1), ruling that owners of lakefront property had established an irrevocable easement in the lake based upon evidence that "they purchased their lots according to a subdivision plat which had a lake area designated on it and paid more for their lakefront lots than the purchase price for non-lakefront lots[.]" (Citations and punctuation omitted.)

Relying upon *Forsyth*, Peck argues that he acquired an irrevocable easement in the golf course since he purchased his lot in accordance with a subdivision plat that had the golf course designated on it, and that he paid more for his lot based on its location on the golf course. Notwithstanding his claim, however, the record does not contain any evidence showing a recorded subdivision plat, as required. Consequently, Peck's claim of an implied irrevocable easement fails.

To the extent that Peck points to evidence pertaining to other subdivisions apart from his own in Section J of the Canongate on Lanier subdivision, his assertions are unavailing. As we held in *Peck II*, "the residential developments [surrounding the golf course] arose out of multiple projects by different developers and resulted in different subdivisions with separate sections." *Peck II*, supra, 304 Ga. App. at 872 (1). Regardless of whether the residents of the other subdivisions could establish that they acquired an implied easement to the golf course, the pertinent question in this case is whether the evidence supported Peck's claim that he had an implied easement as alleged. Our resolution of Peck's claims therefore must focus upon the evidence and circumstances involving Peck's property sale in the Canongate on Lanier subdivision.

Peck points to a marketing brochure and various maps and surveys as purported support for his claim. Upon reviewing those exhibits, however, we conclude that they do not amount to recorded subdivision plats. The "Preliminary Subdivision Plat of Canongate on Lanier Section J Lots" upon which Peck relies was merely a tentative unapproved plat. In addition, the unrecorded plat did not clearly designate the golf course. The survey that was attached to Peck's closing documents also failed to clearly designate the golf course and was not a plat of the subdivision development. Although Peck also points to a recorded survey and plat that were prepared for a prior owner of the property adjacent to the golf course, that survey and plat do not depict the residential subdivision development. None of the

surveys indicate or would authorize a finding that Lanier's golf course provided a right of way or was intended to be included as a part of the subdivision property.[4] See *Eardley v. McGreevy*, 279 Ga. 562, 564 (1) (615 SE2d 744) (2005) (holding that plaintiff failed to establish the existence of an implied easement over her neighbor's property based on an unrecorded plat in a deed merely showing the existence of a drive, but not describing the drive as any type of right-of-way for the plaintiff's property); *De Castro v. Durrell*, 295 Ga. App. 194, 201-202 (2) (a) (671 SE2d 244) (2008) (ruling that the plaintiffs could not rely on an unrecorded plat to claim the existence of an implied easement to a soccer field adjoining their subdivision).

The evidence also failed to indicate that Lanier engaged in actions from which a factfinder could conclude that Lanier participated in a plan or agreement to restrict the use of its land. The developer of the Canongate on Lanier subdivision agreed to advise all prospective purchasers that it was "in no way affiliated with . . . the ownership or operation of the [golf course]" and to give written notice that "no membership or use rights of any kind whatsoever in the [golf course] [were] granted by virtue of the purchase of the subject property from [Arasom]." Moreover, when Lanier sold Peck his lot in the subdivision, Peck was advised that his purchase of the property did not entitle him to any membership or right to use the golf course.

Since Peck failed to present evidence establishing the existence of an implied easement based upon a recorded subdivision plat, the trial court did not err in granting summary judgment in favor of Lanier as to this claim. See *Eardley*, supra, 279 Ga. at 564 (1); *De Castro*, supra, 295 Ga. App. at 201-202 (2) (a).

(b) *The "Oral Assurances" Method.* Peck argues, in the alternative, that there was ample evidence of oral assurances given to purchasers that they were buying a golf course lot. See *Knotts Landing Corp.*, 256 Ga. at 323-324 (2), (3). Based upon this principle, Peck could establish his claim by showing that the developer made oral assurances or representations that the golf course would remain on the property, and that he relied upon those assurances in deciding to purchase his lot. Id.

---

[4] In this case, the undisputed evidence established that the golf course was not developed as a part of the subdivision. Notably, the evidence showed that the golf course had already been developed and was operating for many years prior to the development of the Canongate on Lanier subdivision. The uncontroverted evidence also established that the golf course and the adjacent residential subdivisions were developed separately by multiple unrelated developers and property owners. The evidence in this regard failed to reflect the existence of a common plan or scheme of development.

Significantly, Peck testified that he did not seek assurances that the golf course would remain in existence. Peck's closing documents included an addendum confirming an understanding that the seller was not affiliated with the golf course, and that the purchaser would not receive any right to use the golf course as a result of purchasing a lot. More importantly, Peck's sales contract explicitly stated that "[n]o representation, promise, or inducement not included in [the] contract shall be binding upon any party hereto." The contract did not assert any representations regarding the continued existence of the golf course. "Where a purchaser affirms a contract that contains a merger or disclaimer provision, he is estopped from asserting reliance on a representation that is not part of the contract." (Citation omitted.) *Novare Group v. Sarif*, 290 Ga. 186, 190 (3) (718 SE2d 304) (2011).

> The entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement. [Peck] is, therefore, barred from claiming that he . . . relied on an alleged misrepresentation not contained within the agreement.

(Citations and punctuation omitted.) *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 95 (2) (a) (718 SE2d 35) (2011). Since Peck cannot show that he reasonably relied upon any oral assurances regarding the golf course as a matter of law, the trial court's summary adjudication of this claim was proper.[5]

*Judgment affirmed. Ellington, C. J., and Doyle, P. J., concur.*

DECIDED MARCH 8, 2012 —
RECONSIDERATION DENIED MARCH 27, 2012 — 

*McFarland & McFarland, Robert P. McFarland*, for appellant.
*Dillard & Galloway, G. Douglas Dillard, Andrea C. Jones, Hasty Pope, Marion T. Pope, Jr.*, for appellee.

---

[5] On October 5, 2011, this Court entered orders authorizing the parties to file supplemental briefs. Peck has filed a motion to strike Lanier's supplemental brief as being untimely filed. Peck's motion is denied.