315 Ga. 691
FINAL COPY

S22G0030.  WS CE RESORT OWNER, LLC v. HOLLAND et al.

PINSON, Justice.

A resort community in North Georgia includes a golf course next to a subdivision. The current owner of the resort wants to redevelop the golf course into a residential property, and several homeowners in the subdivision sued to stop it. The trial court concluded that the homeowners had an easement in the golf course and granted a permanent injunction preventing the course from being put to any other use, and the Court of Appeals affirmed.

We granted certiorari and now vacate the Court of Appeals' decision and remand for further proceedings. Both courts below concluded that the homeowners acquired an easement in the golf course because their lots were bought with reference to a subdivision plat that designated a "golf course" next to the subdivision. That conclusion relied on a long line of our decisions recognizing that

easements in features like streets, parks, and lakes could be acquired on this basis, which amounts to an easement by express grant. But golf courses are different. Given the wide range of interests that an easement in a golf course could possibly include— interests in a view, access, use, or enjoyment, to name a few—merely designating a "golf course" on a subdivision plat and selling lots with reference to the plat cannot give reasonable certainty as to the scope of a claimed easement. And unlike with streets and parks, we are not aware of longstanding and settled expectations about golf courses from which intent to grant easements of reasonably certain scope may be inferred. So, although subdivision owners might be able to acquire an easement in a given adjacent golf course, the intent to convey such an interest must be shown through evidence based in the relevant documents taken as a whole, rather than presumed based on the golf course's mere designation on a plat. For these reasons and more set out below, we vacate the contrary decision below and remand for further proceedings consistent with this opinion.

1. *Background*

(a) *The Land*

In 1993, Fountainhead Development, Inc. developed the Chateau Elan resort property, which is currently owned by appellant WS CE Resort Owner, LLC (the "resort owner"). Chateau Elan includes hotels, a spa, a winery, a tennis center, an equestrian center, residential subdivisions, and four golf courses, including the nine-hole "Par 3 Course" at issue here. The Par 3 Course is adjacent to a residential subdivision known as the "Manor Homes" subdivision.

In 1995, a surveyor, Donald Jones, prepared "The Final Plat for Executive Estates — Block A." The Plat was a representation of the Manor Homes subdivision, and also noted the owners and uses of some adjacent properties. On the other side of one boundary of the subdivided area, the plat listed "Fountainhead Development, Inc. (Golf Course)." The adjacent properties were noted on the Plat only generally, with no delineation of boundary lines, specification of acreage, or identification of reference points. Jones stated in an

affidavit that listing adjacent property owners was "typical for plats and [per] local subdivision regulations," but that he did not survey the adjacent golf course and did not intend to include the golf course as part of the Plat.

A realtor for Chateau Elan, Ben Harrison, testified that within the Chateau Elan development, residential lots were known for having either a wooded view or a golf course view, with the golf course views being more expensive. As part of Harrison's pitch to prospective buyers, he would share with them the Master Site Plan, which showed three 18-hole golf courses and the nine-hole Par 3 Course, as well as wooded-view and golf course-view residential lots. He also showed them a marketing brochure for the Manor Homes subdivision, which noted various amenities of the Chateau Elan property, including the golf courses. The brochure explained that "[t]his year we will be introducing an exciting new 'Manor Home' development of smaller homes overlooking the Par 3 golf course."

(b) *The Homeowners*

Evelyn and John McCarthy (with Harrison's help) purchased a

lot in the Manor Homes subdivision in 1995. Evelyn testified that the couple were "especially interested" in the lot "because it was adjacent to an existing Par 3 Golf Course and had a good view of the golf course from its back yard," and that that particular lot's proximity and access to the course was the "sole reason" for their purchase. In purchasing their home, the McCarthys relied on the Master Site Plan and marketing brochure provided to them by Harrison. The McCarthys paid a $15,000 site premium for their lot, which they understood to be because of its proximity and access to the course. The couple played golf on the Par 3 Course, enjoyed their view daily, and also received a free discount card for the course "by virtue of being a homeowner."

Thomas and Connie Holland (with the help of Harrison and the president of Fountainhead) purchased a lot in the Manor Homes subdivision in 1996. Thomas testified that the couple were "especially looking for a home in a golf community." He noted that "[t]he Par 3 Golf Course was an essential part of the concept [of buying a home in Manor Homes]. . . . We were very much drawn to

5

the Manor Homes because of the Par 3 Golf Course." The Hollands paid a $15,000 site premium for their lot, which they understood to be because of its proximity to the course. The Hollands relied on the Plat's depiction of the Par 3 Course as adjacent to the Manor Homes.

(c) *Proposed Redevelopment of the Par 3 Course*

According to the resort owner, the Par 3 Course is not profitable. As a result, the resort owner applied to rezone the Par 3 Course to enable its conversion into a residential development. After its rezoning application was granted, Evelyn McCarthy[1] and the Hollands (collectively, the "homeowners") sued the resort owner in Barrow County Superior Court, seeking (1) an interlocutory injunction to enjoin the resort owner from "taking any action to change the use of the Par 3 Course"; (2) a declaratory judgment that (a) the Par 3 Course is subject to a use restriction limiting the use to operation as a golf course, (b) the use of the property as a golf course cannot be eliminated, and (c) the Par 3 Course cannot be converted to residential uses or any uses other than that as a golf course; and

---

[1] John McCarthy passed away in 2008.

6

(3) attorney fees.

(d) *Decisions Below*

The parties cross-moved for summary judgment. The trial court granted summary judgment to the homeowners, finding that they had established an implied easement that required the resort owner to keep the Par 3 Course operating as a golf course. The court found that an easement had been created by two different methods, which it called the "common-grantor" and "oral assurances" methods, relying on *Peck v. Lanier Golf Club, Inc.*, 315 Ga. App. 176 (726 SE2d 442) (2012).

Applying *Peck*'s common-grantor method, the trial court looked to the plat and other evidence to determine whether the Par 3 Course was "set apart" for the homeowners' use. The court concluded that it was, noting that the plat included "Fountainhead Development, Inc. (Golf Course)" as a description of property adjacent to the subdivision, McCarthy's status as a homeowner in the Manor Homes gave him a special use discount on the course, and the homeowners had paid a premium price to "purchase[ ] an

7

adjacency and proximity" to the course.

Applying *Peck*'s oral-assurances method, the trial court also found that Fountainhead had made oral assurances to the homeowners that the Par 3 Course would remain a golf course. The court pointed out that Fountainhead's marketing materials advertised the Manor Homes as "overlooking the Par 3 Course," and that Fountainhead told buyers they would be buying lots "in a golf course community" and that they could use the course.

Based on these findings, the trial court held that the homeowners were entitled to a permanent injunction "preventing the Par 3 Course from being put to any other use."

The resort owner appealed, and the Court of Appeals affirmed. The Court of Appeals agreed with the trial court that an easement had been created under *Peck*'s common-grantor method. See *WS CE Resort Owner, LLC v. Holland*, 360 Ga. App. 720, 725-732 (860 SE2d 637) (2021). The court explained that the homeowners purchased their lots according to a recorded plat that showed the Par 3 Course next to the Manor Homes subdivision, and that the homeowners

paid a site premium for that proximity to the course, which, the court held, was enough to acquire an easement. See id. The Court of Appeals also upheld the injunction, concluding that the trial court order had sufficiently described the Par 3 Course and the acts to be restrained in relation to it. See id. at 732-735.

We granted certiorari.

2. *Analysis*

(a) Speaking generally, an easement is an interest in land owned and possessed by another. See, e.g., *Hollomon v. Bd. of Ed. of Stewart County*, 168 Ga. 359, 364 (147 SE 882) (1929) ("[a]n easement is a right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with the general property in the owner") (citation and punctuation omitted). See also *Southern R. Co. v. Wages*, 203 Ga. 502, 503 (1) (47 SE2d 501) (1948) (holder of an easement has an interest in "realty" but "is not the owner or occupant of the estate over which the right extends"); Daniel F. Hinkel, 1 Pindar's Ga. Real Estate Law & Procedure § 8:1 (7th ed., Apr. 2022 update)

9

("Pindar's"); Jon W. Bruce & James W. Ely, Jr., The Law of Easements & Licenses in Land § 1:1 (Aug. 2022 update). That interest, which can be created in a number of ways, see OCGA § 44-9-1, typically amounts to some limited right to use the land—common examples include the right to access utilities (like power or gas lines), see *Simpson v. Colonial Pipeline Co.*, 269 Ga. 520, 521 (2) (499 SE2d 634) (1998) (gas utility had easement in its gas pipelines across homeowners' property); *Ga. Power Co. v. Leonard*, 187 Ga. 608, 609 (1 SE2d 579) (1939) (electric utility held easement giving it "the privilege of erecting and maintaining a power line over" subject property while landowner reserved "the right of cultivation and ingress and egress"), or to access other land, see *Sadler v. First Nat. Bank of Baldwin County*, 267 Ga. 122, 122 (475 SE2d 643) (1996) (bank held easement in access road across other property).

This case concerns a kind of easement specific to residential subdivisions. Georgia law has long recognized that when a developer conveys lots with reference to a subdivision plat, the grantees may receive easements in certain features—mostly streets and parks—

10

that are designated on the plat. See *Stanfield v. Brewton*, 228 Ga. 92, 94-95 (1) (a)-(b) (184 SE2d 352) (1971) (citing *Schreck v. Blun*, 131 Ga. 489 (62 SE 705) (1908)) (explaining that "[w]here the owners of a tract of land subdivide it into lots, record a map or plat showing such lots, with designated streets and a public park, and sell lots with reference to such map or plat," the purchasers "have an easement in these public areas"); *East Atlanta Land Co. v. Mower*, 138 Ga. 380 (75 SE 418) (1912); *Ford v. Harris*, 95 Ga. 97, 101 (22 SE 144) (1894) ("[I]f the owner of land lays out streets and alleys and afterwards sells lots bounding upon them, . . . the purchasers of those lots acquire the right to have the strips designated as streets remain open for their use as a perpetual easement over the ground for ingress to and egress from their property."); 1 Pindar's § 8:15.

Our early decisions recognizing the rights of subdivision lot owners in streets and parks designated on their plats were often grounded in a theory of estoppel. The reasoning went that subdivision developers include features like streets and parks to "mak[e] the residence lots more desirable to prospective

11

purchasers," *Caffey v. Parris*, 186 Ga. 303, 306 (1) (197 SE 898) (1938), and conveying those lots with reference to a unified plan that integrates and designates those basic features is a "representation" that the features are meant for the grantees' future use and enjoyment. *Schreck*, 131 Ga. at 492. Because "it is just to presume that the purchasers paid the added value" for the benefits of living next to a park or within a convenient network of streets, *Adair v. Spellman Seminary*, 13 Ga. App. 600, 606 (79 SE 589) (1913), the purchaser had "a right to rely upon the plan which the grantor promulgated, and on which he acted," *Schreck*, 131 Ga. at 491 (explaining that "[s]ome of the considerations inducing the purchase" of a lot with reference to a subdivision plat that designated a street "may have been the probability of having neighbors, particular uses to which the purchased premises might be put because of the street, and the prospect of an advance in value from buildings to be erected on other lots"). See also *Adair*, 13 Ga. App. at 606 ("[c]ertainly, as every one knows, lots with convenient cross streets are of more value than those without"); 1 Pindar's §

8:15 ("The fact that a lot is surrounded by a network of streets and alleys is generally considered as greatly increasing its market value through added accessibility, availability of public utilities and services, and the attraction of desirable neighbors."). So, when a subdivision owner sold lots with reference to a plat that designated streets or parks, we would hold that the seller was "estopped from asserting a claim adverse to the right of the purchasers" to use the streets and parks and have them kept open for their use. *Caffey*, 186 Ga. at 306 (1). See *Tietjen v. Meldrim*, 169 Ga. 678, 697 (151 SE 349) (1930) ("When a grantor sells lots of land . . . shown upon a plat . . . referred to [in the deeds] as laid out in a subdivision of the grantor's land, he is estopped to deny the grantees' right to use the streets delineated in such plat."); *Mower*, 138 Ga. at 388 ("[I]f the lots were sold with reference to the plats which contained a delineation of the parks, and the original purchasers bought with reference thereto, the seller is estopped from setting up a claim adverse to the right of private individuals, or their assigns, who so bought."); *Schreck*, 131 Ga. 489; *Ford*, 95 Ga. 97. See also Law of Easements & Licenses in

Land § 4:30 (explaining that easements implied from deed descriptions may be grounded in an estoppel theory, citing *Hamil v. Pone*, 160 Ga. 774 (129 SE 94) (1925), among other decisions).

This estoppel theory, however, has given way in our decisions to the view that these interests in streets and parks acquired by owners who buy lots with reference to subdivision plats are in fact easements acquired by "express grant." *Walker v. Duncan*, 236 Ga. 331, 332 (223 SE2d 675) (1976). The rationale is mostly the same: it still starts with the understanding that conveying lots with reference to a subdivision plat that integrates features like streets and parks can represent that they are "set apart for" the grantees' use. Id. And this inference is still strengthened by the commonsense presumptions that developers include these features to induce buyers to buy, and pay more for, their property. See, e.g., *Higgins v. Odom*, 246 Ga. 309, 309-310 (271 SE2d 211) (1980) (in holding that the sale of lots by reference to a subdivision plat with "a lake area designated on it" granted an easement in the lake, explaining that "[t]he availability of the lake constitutes a material part of the value

14

of the adjoining property, and is often the principal incentive for its purchase") (citation omitted); *Walker*, 236 Ga. at 332 (explaining that "[t]he property owners were enticed into purchasing their lots, and presumably paid a greater price for them, by the implied promise of the developer to preserve this lake area as a park"). This inference, however, is more than a basis for estoppel: because the plat in these cases is a graphical representation of the plan the purchaser is buying into, we have recognized that the grantees who buy with express reference to the plat have "acquired an easement [in the streets or parks designated on the plat] as effectively as if the deed had specifically granted it." *Westbrook v. Comer*, 197 Ga. 433, 439 (29 SE2d 574) (1944). See also *Tietjen*, 169 Ga. 678; Law of Easements & Licenses in Land § 4:31 (putting Georgia decisions in category of cases that "suggest that such easements are really express servitudes because they are graphically represented on the plat" (citing, among other decisions, *Sadler*, 267 Ga. 122; *Fairfield Corp. No. 1 v. Thornton*, 258 Ga. 805 (374 SE2d 727) (1989); *Smith v. Gwinnett County*, 248 Ga. 882 (286 SE2d 739) (1982); *Walker*, 236

15

Ga. 331)).

(b) Of course, not every word or mark that designates property on a subdivision plat grants an easement to lot owners. For example, subdivision plats routinely identify or describe the various lots in the subdivision as well as neighboring properties, but no one would seriously suggest that a lot owner who buys with reference to the plat gets an easement in all of their neighbors' property merely because it is labeled.[2] Instead, the question is whether we can infer from the designation on the subdivision plat a "clear intent" to set apart the designated area for the lot owners' use or enjoyment. *Miller v. Wells*, 235 Ga. 411, 416 (219 SE2d 751) (1975), disapproved on other grounds, *Wheatley Grading Contractors, Inc. v. DFT Investments, Inc.*, 244 Ga. 663 (261 SE2d 614) (1979). See also *Goodyear v. Trust Co. Bank*, 247 Ga. 281, 285 (2) (276 SE2d 30) (1981) (declining to recognize that lot owners in beach subdivision had a recreational easement in beach because the plats in question

---

[2] Georgia's standards for property surveys require plats to include "[t]he names of adjacent property owners on all lines" of the plat. Ga. Comp. R. & Regs., r. 180-7-.07 (d) (14).

16

"do not indicate any intent on the part of the developer to create" such an easement); *Rolleston v. Sea Island Properties, Inc.*, 254 Ga. 183, 184 (1) (327 SE2d 489) (1985) (explaining that in *Goodyear*, the crucial inquiry was to look at "the intent of the parties at the time of the conveyances to determine whether any recreational easement had been conveyed"); *Smith v. Bruce*, 241 Ga. 133, 143 (1) (244 SE2d 559) (1978) (focusing inquiry on the "intent of the subdivider to grant easements in this open area"); *Walker*, 236 Ga. at 332 ("It is well-established that where a developer sells lots according to a recorded plat, the grantees acquire an easement in any areas set apart for their use.").

(i) For a small category of features, designating them appropriately on the subdivision plat is enough, absent contrary evidence based in the plat or deed, to demonstrate clear intent to grant an easement in the features to lot owners who bought with reference to the plat. Our decisions have included in this category (1) streets designated and laid out on the subdivision plat, see *Schreck*, 131 Ga. 489; *Ford*, 95 Ga. 97; (2) parks, see *Caffey*, 186 Ga.

17

303; *Mower*, 138 Ga. 380; and (3) lakes, which we have equated to parks, see, e.g., *Higgins*, 246 Ga. 309; *Walker*, 236 Ga. 331.

These features share two related things in common. First, there is simply a well-settled understanding, reflected in more than a century of our decisions, that when these basic features are designated on a subdivision plat, there is ordinarily no reason to doubt that they are included as part of the unified plan for the subdivision and meant for the lot owners' use. See, e.g., *Hendley v. Overstreet*, 253 Ga. 136, 136 (318 SE2d 54) (1984) ("It is well settled that when a subdivision contains an attraction such as a park or lake which renders the lot more desirable, the sale of lots in reference to a plat showing the attraction will create an irrevocable easement in such an area for the lot owners."). Second, these are the sort of features for which designation or delineation on the plat alone can give reasonable certainty about the scope of the easement granted. See *Macon-Bibb County Indus. Auth. v. Central of Ga. R. Co.*, 266 Ga. 281, 283 (3) (466 SE2d 855) (1996) ("An express grant of an easement must contain language sufficient to designate

18

with reasonable certainty the land over which it extends." (quoting 1 Pindar's § 8:18)); *Howard v. Rivers*, 266 Ga. 185, 186 (2) (465 SE2d 666) (1996) ("The description of an easement is sufficient if it provides a key so that the land where the easement is located can be identified."). When a subdivision plat designates a strip of land as a street, it conveys with reasonable clarity that purchasers would acquire a right to have the strip "remain open for their use . . . for ingress to and egress from their property"—that is, to use it as a street. *Ford*, 95 Ga. at 101. The same goes for a park or lake: when these open and passive recreational features are delineated on a plat, the designation itself identifies with reasonable certainty an easement for recreational use that extends across the delineated area. See, e.g., *Mower*, 138 Ga. at 391 ("The word 'Park,' written upon a block of land designated upon a map, is as significant of a dedication, and of the use to which the land is dedicated, as is the word 'street,' written upon such map. The word carries with itself the idea of an open or enclosed tract of land for the comfort and enjoyment of the inhabitants of the city or town in which it is

19

located, and is so defined by lexicographers. . . . In London, as well as in any city in this country, the term 'park' signifies an open space intended for the recreation and enjoyment of the public, and this signification is the same, whether the word be used alone or with some qualifying term, as Hyde Park, or Regent's Park, or, as in the present case, 'Central Park.'" (quoting *Archer v. Salinas City*, 28 P. 839, 841 (Cal. 1892)); *Higgins*, 246 Ga. at 310 (lake designated on plat "should be regarded as in effect a dedication of the lake as a recreational area for the benefit of all adjoining owners"). In other words, settled expectations rooted in more than a century of practice and the relative ease with which the scope of an easement in these features can be discerned support a strong presumption that designating these features on a subdivision plat conveys an intent to grant an easement to lot owners who buy with reference to the plat.

(ii) For other kinds of features, however, our decisions have not accepted mere designation on a subdivision plat as sufficient indicia of intent to grant an easement.

In a series of decisions involving asserted easements in beaches, rather than simply noting that lots were sold with reference to a subdivision plat that designated the beach areas in question, we looked to the plat as a whole (and the deed referencing the plat) for evidence of the developer's intent to grant easements. See *Rolleston*, 254 Ga. at 183-184 (1); *Goodyear*, 247 Ga. at 285 (2); *Smith*, 241 Ga. at 141-143 (1). In *Smith*, for example, we concluded that a sale with reference to a plat granted easements in the beach designated on it based on a list of clues from the plat that established the requisite intent, including

> [t]he naming of the subdivision, "East Beach Subdivision"; the subdividing of practically all of the land area owned except the beach area; the designating of the front or easternmost street as "Beach Drive"; the leaving of an open area between an area designated as "smooth, hard beach" and "Beach Drive" without any reservations; the entering on the plat "Atlantic Ocean"; the failure to afford otherwise any reasonable means of access from the lots and streets in East Beach Subdivision to the smooth, hard beach and ocean; the designation of a line as "mean high water line" between the area designated as smooth, hard beach and "Beach Drive"; and the selling of one or more lots referring to such area in the recorded plat.

Id. at 142 (1). And we reached the opposite conclusion in *Goodyear*

21

because the plats in question included "express reservation[s]" as to the beach and did not otherwise "indicate any intent on the part of the developer to create a recreational easement." 247 Ga. at 285 (2). See also *Rolleston*, 254 Ga. at 183-184 (1) (pointing out that the crucial inquiry in *Goodyear* was to look at "the intent of the parties at the time of the conveyances to determine whether any recreational easement had been conveyed" and reaffirming conclusion that plats in those cases did not show intent to convey easement in beach areas in question).

We also rejected the simplified plat-designation-as-intent analysis that we had applied to streets and parks in concluding that subdivision lot owners did not have an easement in a "commercial boating and swimming venture." *Altman v. Quattlebaum*, 253 Ga. 341, 342 (1) (320 SE2d 179) (1984). The venture had been in existence (and owned by the subdivision developer) when it was designated on the subdivision plat as a "Recreational Center." Id. In denying the lot owners' easement claims, we pointed out that while the venture was in operation, "subdivision lot owners, as well as

members of the general public, were charged fees for boating and swimming privileges" there; the tract "was under fence, except for the lake frontage, and it was closed each year to everyone from after Labor Day until early April"; "[n]o subdivision lot owner ever complained of having to pay use fees, or of being excluded during the fall and winter seasons, or of exclusion from the tract while used by the YMCA, or when it was closed later to *all* uses"; and "[t]here were no deed covenants, plat restrictions, or property association agreements in reference to the tract." Id. Although there was "testimony that some subdivision lot owners had used picnic facilities without charge," the evidence as a whole did not establish any "right to use the tract" in favor of the lot owners. Id.

We did not explain in these decisions why we required a demonstration of intent to convey an easement based on the deed and plat as a whole rather than the simplified analysis used for streets, parks, and lakes. But the distinction we identify today is reasonable. We are aware of no longstanding or entrenched expectations about beaches or active businesses like those

animating our decisions recognizing easements-by-subdivision-plat in streets, parks, or lakes. That difference alone seems enough to decline to extend the near-automatic recognition of such easements to other features. In addition, at least for the swimming and boating venture (and other active businesses open to the public), designation or delineation on the plat alone would not normally provide enough certainty about the nature or scope of the easement granted as would designating a passive feature like a street, park, or lake. Simply put, it is not clear or obvious to us what property interests a lot owner's "easement" in an adjacent business might include, and such uncertainty cuts against recognizing such an easement based on only the business's mere designation on a plat.[3]

In sum, our easement-by-subdivision-plat decisions have distinguished between easements in two kinds of features. Historically, easements in basic features like streets, parks, and

---

[3] We acknowledge that beaches do not seem all that different from parks or lakes in this regard, but the lack of well-settled expectations about beaches as integrated features of subdivisions, at least as far as our decisions show, is enough to distinguish them from streets, parks, and lakes.

lakes that are integral parts of a unified subdivision plan, the scope of which typically can be ascertained with reasonable certainty from their mere designation on the plat, can be granted by such designation plus sale of lots with reference to the plat. Before recognizing easements in other features, by contrast, our decisions have required a more traditional showing of intent inferred from evidence based in the relevant documents taken as a whole.

(c) Do golf courses fall into the limited category of features for which recognizing an easement-by-subdivision-plat is near-automatic? We cannot reject the idea out of hand. As with streets, parks, and lakes, developers almost certainly include golf courses in subdivision plans to induce buyers to buy, and pay more for, lots in those subdivisions, and those buyers might reasonably expect the promised golf course to be built, maintained, and operated for their use or enjoyment for years to come. These sound like some of the reasons our past decisions have given for recognizing easements-by-subdivision-plat as a general matter.

But the reasons for recognizing easements in streets, parks,

25

and lakes based on plat designations alone—rather than the more typical showing of intent we have required for other features—do not apply to golf courses. First, whatever assumptions based in common sense or experience one might have about golf course subdivisions, they pale in comparison to the longstanding and widely accepted understanding about the meaning of designating streets or parks on a subdivision plat. The ease with which our decisions have recognized easements in these features based on mere plat designations comes in large part from more than a century of settled expectations about the intent that can be inferred from such designations. See *Ford*, 95 Ga. at 101; *Mower*, 138 Ga. at 391. We are not aware of (and the parties have not identified) any even remotely similar set of longstanding expectations about golf courses.

Second (and related to the first reason), merely designating a golf course on a plat, without more, typically does not give reasonable certainty about the scope of any easement in it. See *Howard*, 266 Ga. at 186 (2); 1 Pindar's § 8:18. The difficulty is that there is much more to a golf course than a mere strip of land or open

26

area. Even at its most basic, a golf course is an area of land that is laid out and actively maintained in a configuration and condition that allows someone to play the game of golf on it. See, e.g., *Golf course,* Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/golf%20course (last visited January 25, 2023) ("an area of land laid out for the game of golf with a series of 9 or 18 holes each including tee, fairway, and putting green and often one or more natural or artificial hazards"). Anyone familiar with golf courses would likely also expect one to include basic supporting amenities: golf carts, a clubhouse with restrooms and locker rooms, a pro shop, and even some kind of food and beverage service. And as far as we know, developing and maintaining all of these things that make up a typical golf course requires an ongoing business.[4]

---

[4] This brief description of a generic golf course and its expected features should not be taken as an opinion, authoritative or otherwise, about the fundamental characteristics of a "golf course" or the game of golf. We leave such questions to the proper authorities. Cf. *PGA Tour, Inc. v. Martin*, 532 U.S.

This relative complexity means it is not at all obvious what an easement in any given golf course might look like. Would it give a lot owner merely the right to a view of something that looks like a golf course, or a greater right to access or even play golf on the course? If the interest includes access, could the lot owner traverse the entire property? This is not to say that lot owners could never acquire an easement in a golf course. But it does mean that, in contrast to streets, parks, and lakes, merely printing the phrase "golf course" on a subdivision plat does not provide reasonable certainty as to the scope of a claimed easement in the golf course. The range of possible property interests a lot owner might desire or expect from such an easement is too wide, and no longstanding or settled expectations exist to narrow or fix the interests in question.

The bottom line is that golf courses do not fall into the limited

661, 700 (121 SCt 1879, 149 LE2d 904) (2001) (Scalia, J., dissenting) (declaring (with no small amount of sarcasm) that "[i]t has been rendered the solemn duty of the Supreme Court of the United States, laid upon it by Congress in pursuance of the Federal Government's power 'to regulate Commerce with foreign Nations, and among the several States,' to decide What Is Golf." (cleaned up)).

set of features for which a plat designation alone presumptively demonstrates the clear intent needed to recognize an easement in those features. Instead, the necessary intent must be demonstrated case-by-case through evidence based in the deed and plat as a whole. See *Smith*, 241 Ga. at 142 (1); *Goodyear*, 247 Ga. at 285 (2); *Altman*, 253 Ga. at 342 (1).

(d) Here, the Court of Appeals concluded that the lot owners acquired an easement in a golf course based only on a showing that the lot was purchased with reference to a recorded subdivision plat that "depicted" the course adjacent to the subdivision and paid a premium for the lot's proximity to the course. See *WS CE Resort Owner, LLC*, 360 Ga. App. at 725-726. That conclusion was understandable: our body of easement-by-subdivision-plat decisions is old and messy, and the distinction between the simplified plat-designation-plus-sale analysis and the broader intent analysis was, until now, implicit. But because our holding today rejects the former analysis for golf courses, we vacate the Court of Appeals' decision

and remand for further proceedings.[5]

On remand, the key question is simply whether the intent to grant an easement in the golf course was shown with sufficient clarity. Our past decisions addressing that question outside of the special cases of streets, parks, and lakes offer some guidance. In those decisions, we looked to evidence based in the deed and plat as a whole and considered, for example, how integral to the subdivision the feature in question appeared, see *Smith*, 241 Ga. at 142 (1) (noting centrality of beach to subdivision based on names of

---

[5] We also disapprove the Court of Appeals' earlier decision in *Peck v. Lanier Golf Club, Inc.*, 315 Ga. App. 176 (726 SE2d 442) (2012), to the extent that it applied the same plat-designation-plus-sale analysis to golf courses.

We further note that some decisions of the Court of Appeals appear to have required proof that a lot owner actually paid a premium for her lot as a prerequisite for recognizing an easement by subdivision plat. See *WS CE Resort Owner, LLC*, 360 Ga. App. at 727-728; *Camp Cherokee, Inc. v. Marina Lane, LLC*, 316 Ga. App. 366, 369 (729 SE2d 510) (2012) (concluding that no implied easement existed for lake access, where the lake was not set apart for the lot owners' use when there was no evidence that the owners paid premiums for their lots and the lots were not adjacent to the lake); *Peck*, 315 Ga. App. at 179 (explaining that to establish an implied easement in a subdivision golf course, plaintiff had to show that he purchased lot according to plat and that he "paid more" for a "golf course lot"). Although our decisions recognizing such easements have noted that lot owners paid or "presumably paid" a premium for lots that reflects the enhanced value created by including features like streets, parks, or lakes, we see no basis in those decisions for requiring specific proof of such higher payments to establish that an easement was granted. We disapprove these decisions to the extent they impose such a requirement.

subdivision and street, among other things); whether the feature was included without any express reservations, see id. (open beach area noted on plat "without any reservations"); *Goodyear*, 247 Ga. at 285 (2) (noting "express reservation" made to use and title in the soft sand beach in question); and whether the plat provided for other reasonable access to the feature, see id.

Other questions may inform this intent analysis for a golf course. For example, North Carolina courts addressing whether lot owners had an easement-by-subdivision-plat in a golf course have looked to how precisely the golf course was depicted on the plat: in their view, plats did not show that a developer "clearly intended" to grant an easement in the golf course when they (1) included a "dotted line location of the golf course greens and fairways" with no metes and bounds, *Friends of Crooked Creek, L.L.C. v. C.C. Partners, Inc.*, 802 SE2d 908, 914 (N.C. Ct. App. 2017); (2) showed "golf course holes . . . depicted adjacent to some of the residential lots" with the "outer boundaries" of the golf course "either not marked at all or . . . depicted with dotted lines" with no metes and bounds, *Home Realty*

*Co. & Ins. Agency, Inc. v. Red Fox Country Club Owners Assn., Inc.*, 852 SE2d 413, 427 (N.C. Ct. App. 2020); or (3) did not "depict the entire Subject Property, complete with a metes and bounds description, being used as a golf course" but only "label[ed] or illustrate[d]" some of the holes of a golf course and did not "demarcate between areas labeled as a golf course" and other "future development," *Cape Homeowners Assn., Inc. v. Southern Destiny, LLC*, 876 SE2d 568, 576 (N.C. Ct. App. 2022). The second of these decisions explained that "because nothing on the plat or referred to therein would enable a title attorney to determine the precise boundaries of the area burdened with the golf course easement, the plat is not capable of describing or reducing an easement in the golf course to a certainty." *Red Fox Country Club Owners Assn.*, 852 SE2d at 427 (cleaned up). Although we do not suggest that North Carolina easement-by-subdivision-plat law is identical to Georgia's, we agree that looking to how precisely the golf course is described and depicted on the plat is relevant to the intent analysis required by our law, particularly given the need to provide reasonable

certainty as to the nature and scope of any claimed easement in the golf course. See *Macon-Bibb County Indus. Auth.*, 266 Ga. at 283 (3); *Howard*, 266 Ga. at 186 (2). But see *Murdock v. Ward*, 267 Ga. 303, 303 (1) (477 SE2d 835) (1996) ("[T]he law does not require perfection in the legal description of an easement.").

A final point about evidence. Our easement-by-subdivision-plat decisions have largely focused only on the plat itself (and the deed that references the plat) to determine whether an easement has been granted. See, e.g., *Goodyear*, 247 Ga. at 285 (2) (explaining that homeowner did not have easement to soft sand portion of beach because the "plats [did] not indicate any intent . . . to create a recreational easement as to the entire soft sand beach"); *Smith*, 241 Ga. at 141-142 (1) (describing plat and concluding that "the sale of a single lot with reference to the plat would complete the granting of an easement"); *Caffey*, 186 Ga. at 306-307 (1) (referring to plat showing land subdivided into streets, residential lots, and parks, and concluding that homeowner who purchased lot "with reference to the plat" acquired easement in park); *Schreck*, 131 Ga. at 491-492

33

(holding that where landowner sells land "with reference to" a plat, the purchaser "has a right to rely upon" an easement shown on the plat). This approach seems to us most consistent with the rationales for recognizing this kind of easement, and it is supported by the practical concern that a title attorney, unaware of extrinsic evidence like marketing materials or oral assurances made decades ago, still needs to be able to discern the existence of this kind of easement through a careful title search. See, e.g., *Neeley v. Fields*, 879 SE2d 728) (N.C. Ct. App. 2022) (attorneys did not commit malpractice by drafting warranty deed that stated property was subject to "Utility Easements, of record, if any," without specifying any such easements, because title search would have revealed existing easement); *Smith v. Tolbert*, 211 Ga. App. 175, 176 (438 SE2d 655) (1993) (sellers of land not required to defend purchasers against easement-holder's claim to possess easement in fee simple, when purchasers' title search revealed existence of easement and purchasers did not include easement in list of matters to be resolved before closing). See also *Merlino v. City of Atlanta*, 283 Ga. 186, 188-

189 (1) (657 SE2d 859) (2008) (holding that purchaser acquired land free of an easement when neither title search nor land survey nor other "ordinary diligence" revealed its existence).

That said, in a couple of these decisions, we have also considered evidence from beyond the plat and deed. See *Altman*, 253 Ga. at 342 (1) (considering historical limitations on homeowners' ability to access and use the commercial boating and swimming venture at issue, including that they paid fees, that the tract was fenced except for the lake frontage, and that the business was closed altogether in the fall and winter); *Miller*, 235 Ga. at 413-416 (when plat designated "reserved" strip of land behind residential lots but was ambiguous as to whether land was reserved for original grantor or adjacent lots, considering testimony about history of use). We did not explain in those decisions why we considered such evidence. Perhaps we applied the rule we have set out for express easements, which allows consideration of parol evidence if the written instrument is ambiguous. See *Irvin v. Laxmi, Inc.*, 266 Ga. 204, 205 (1) (467 SE2d 510) (1996). That rule makes sense for construing a

true express easement, where the *grant* of an easement is clear—so a title search could discover it—and the ambiguity in question would concern the easement's *scope*. See, e.g., *Crabapple Lake Parc Cmty. Assn., Inc. v. Circeo*, 325 Ga. App. 101, 105-106, 109 (1) (a) (751 SE2d 866) (2013) (applying ordinary rules of contract construction to determine scope of express easement and considering parol evidence to resolve ambiguity). See also *Mun. Elec. Auth. of Ga. v. Gold-Arrow Farms, Inc.*, 276 Ga. App. 862, 866-867 (1) (625 SE2d 57) (2005) (explaining that construing the language in express easements is governed by rules of contract construction, including the consideration of parol evidence if "the written instrument is ambiguous"). Or, maybe this question of what evidence is properly considered to determine the existence of an easement-by-subdivision-plat simply was not raised. In any event, we are skeptical that evidence from outside the plat and deed is properly considered, at least as a general matter, in determining whether an easement is created by the sale of a lot with reference to a subdivision plat rather than with express language in a deed.

36

The above guidance is just that. The ultimate inquiry cannot be reduced to a multi-factor test, but rather asks simply whether the evidence, taken as a whole, demonstrates clear intent to grant an easement in the property in question. See *Miller*, 235 Ga. at 416; *Smith*, 241 Ga. at 142; *Goodyear*, 247 Ga. at 285 (2); *Altman*, 253 Ga. at 342 (1). We leave it to the courts below to answer this question in the first instance.[6]

*Judgment vacated and case remanded. All the Justices concur.*

---

[6] We leave for remand the question whether any material issues of disputed fact preclude summary judgment on this question. And because we vacate and remand the decision below for further proceedings as to the existence of an easement in the golf course, we also do not reach any questions about the appropriateness or scope of the trial court's injunction against the resort owner. We further express no opinion on whether the trial court correctly found that an easement was granted under *Peck*'s oral-assurances method, although we note that *Peck* indicates that such method could establish an "implied covenant," not an easement. See *Peck*, 315 Ga. App. at 178, 181 (explaining that the lot owner claimed an "easement or an implied covenant in the golf course" and citing as support for the "oral assurances" method only *Knotts Landing Corp. v. Lathem*, 256 Ga. 321 (348 SE2d 651) (1986), an "implied covenant" decision).

Decided February 21, 2023.

Certiorari to the Court of Appeals of Georgia — 360 Ga. App. 720.

*Smith Gambrell & Russell, Leah Ward Sears, Edward D. Burch, Jr., Edward H. Wasmuth, Jr.; Burr & Forman, John O. Sullivan, Kevin R. Stone; Dillard Sellers, Julie L. Sellers, Jeffrey S. Haymore, Randolph B. Russell*, for appellant.

*Stell Smith & Mattison, John E. Stell, Jr.*, for appellees.

*Miles Hansford & Tallant, Joshua A. Scoggins, K. Stanton Kincaid III*, amici curiae.